# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | |
|---|---|
| **ERIC NOBLE,** | : Case No. 1:20-cv-00594 |
| | : |
| **Plaintiff,** | : |
| | : Judge Michael R. Barrett |
| v. | : |
| | : |
| **THE PUBLIC LIBRARY OF CINCINNATI** | : |
| **AND HAMILTON COUNTY, THE BOARD** | : **DEFENDANTS' MOTION FOR** |
| **OF TRUSTEES OF THE CINCINNATI** | : **SUMMARY JUDGMENT** |
| **AND HAMILTON COUNTY PUBLIC** | : |
| **LIBRARY, MONICA DONATH KOHN,** | : |
| **ELIZABETH H. LAMACCHIA, KAREN R.** | : |
| **CLEMONS, NADINE L. ALLEN, ROBERT** | : |
| **G. HENDON, GREGORY W. OLSON,** | : |
| **DIANE CUNNINGHAM REDDEN, PAULA** | : |
| **BREHM-HEEDER, and KYLA HARDIN,** | : |
| | : |
| **Defendants.** | : |

COME NOW Defendants, The Public Library of Cincinnati and Hamilton County, the Board of Trustees of The Cincinnati and Hamilton County Public Library, Monica Donath Kohen, Elizabeth H. LaMacchia, Karen R. Clemons, Nadine L. Allen, Robert G. Hendon, Gregory W. Olson, Diane Cunningham Redden, Paula Brehm-Heeger, and Kyla Hardin (collectively referred to as "Public Library"), by and through counsel, and hereby move the Court for summary judgment pursuant to Federal Rule of Civil Procedure 56. There are no genuine issues of material fact, and all of Plaintiff Eric Noble's claims against Public Library must be dismissed with prejudice.

This Motion is supported by the attached Memorandum the separately-filed depositions of Plaintiff Eric Noble (Doc. 11), Paula Brehm-Heeger (Doc. 8), Kyla Hardin (Doc. 9), and Wei Liu (Doc. 10) as well as the Affidavit of Paula Brehm-Heeger, attached hereto as Exhibit F.

Respectfully Submitted,

*/s/ Felix J. Gora*
Felix J. Gora (0009970)
Megan E. Mersch (0095428)
RENDIGS, FRY, KIELY & DENNIS, LLP.
600 Vine Street, Ste. 2650
Cincinnati, Ohio 45202
513-381-9200-Phone
513-381-9206-fax
fgora@rendigs.com
mmersch@rendigs.com
*Attorneys for Defendants*

2

**MEMORANDUM**

**I.     General Overview**

Plaintiff Eric Noble ("Noble") has sued the Board of Trustees of the Cincinnati and Hamilton County Public Library, the Library itself, all of the Board members "individually," the Library's Executive Director, Paula Brehm-Heeger, and its Human Resources Director, Kyla Hardin. The lawsuit, brought pursuant to 42 U.S.C. §1983, concerns Noble's termination from the Library after his posting/sharing on Facebook of a "meme" on his "wall" (i.e. his profile).

The top portion of the meme reads "All Lives Splatter." Just below that phrase is a stick-figure illustration of violence. Below the image reads "Nobody Cares About Your Protest." As to the illustration, the image consists of a hand drawing of a vehicle and human figures. One person is in front of the car running away from the car, another person is across the hood of the car, and a third person is behind the car on the ground or just above the ground in a prone position. A copy of the meme is attached hereto as Exhibit A. Noble was "friends" with various Library co-workers on Facebook, among other people, and they saw his share/post of the meme. Noble, on his Facebook profile "About" section, noted he worked as a security guard for the Library.

Indeed, Noble was a security guard in the safety and security services department of the Library. His job duties placed him in charge of the safety and security of Library patrons, guests, and staff. Noble contends that, since the meme was posted off-duty, he has a First Amendment free speech right to make such a posting without any consequence. Noble contends his termination based on his meme, therefore, violated his free speech rights, and hence his rights under 42 U.S.C. § 1983.

In short, the meme at issue does not raise "a matter of public concern," and therefore it is not protected under the First Amendment. See *Connick v. Myers*, 461 U.S. 138 (1983). Further,

even if the "expression" does raise matters of public concern, the Court must then determine whether the employee's free speech interest outweighs the efficiency interest of the government employer. Clearly, here, it does not, particularly based on Noble's job function and responsibilities. See *Rogers v. Banks*, 344 F.3d. 587, 602 (6th Cir. 2003).

Noble's job was to be a security guard – protecting the safety and well-being of his colleagues as well as the general public. He also drove Library vehicles for services provided by the Library, and he was given independent responsibility and total discretion to unilaterally take action against members of the public. In addition, Noble's comments and conduct had the capacity to do significant harm to the Library's relationship with the diverse community it serves.

During questioning by the Library about his meme, Noble's only response was that he thought the meme was "funny." It was not. The Library is entitled to summary judgment as a matter of law.

**II.     Factual Overview**

    A.     <u>Testimony of Eric Noble</u>

Noble started his position at the Library on February 25, 2017. His position was security guard. He reported to the Safety and Security Manager, Wei Liu. (Deposition of Eric Noble ("Noble Dep.") (Doc.11), pp. 40-41, 43). Noble identified his written job description. Noble "signed off" on the job description on July 3, 2019. (Eric Noble Deposition Exhibit ("Noble Dep. Exh.") (Doc. 11) 9, pp. 55-56, 80). The job description lists, in pertinent part, under Position Summary, as Noble being responsible for protecting and securing Library property against fire, theft, vandalism and illegal entry; enforcing building rules and regulations; and providing staff and customers with a safe and secure environment. The job description is attached hereto as Exhibits B1 and B2. (See Doc. 11, Exhibits 8-9 - Noble Dep. Exh. 8-9.)

4

The security guard position description also noted that potential functions of the job included: (1) engaging with customers to address issues in order to quickly defuse situations and minimize disruption; (2) discussing infractions or violations with customers, assess appropriate actions, and escort customers from premises if necessary; (3) securing premises and personnel by patrolling property, monitoring surveillance equipment, inspecting buildings, equipment and access points permitting entry; (4) monitoring and authorizing entrance and departure of employees, visitors, and other persons to guard against theft, maintain security of premises; (5) responding quickly to requests for security presence during unusual incidents; (6) monitoring closed-circuit television; (7) calling police or fire departments in case of emergency, such as fire and presence of unauthorized persons; and (8) driving motor vehicles to transport individuals to specified locations.

Under specific requirements of the job, Noble acknowledged he must: (1) exercise independent judgment in the execution of job responsibilities, often with minimal supervision; (2) demonstrate a willingness to listen and work through complaints from the public in difficult situations in a calm and diplomatic matter; (3) exhibit tact and patience when working with personnel, visitors and government; (4) work independently in a team environment; (5) possess the ability and willingness to work harmoniously with other personnel; and (6) NOT PROVE A DIRECT THREAT TO THE HEALTH OR SAFETY OF OTHER INDIVIDUALS IN THE WORKPLACE.  Before signature on the job description, Noble admitted he had read the job description, understood the requirements, accepted the position, and agreed to perform the identified essential functions in a manner in accordance with the Public Library's established procedures.  (See Exhibits B1, B2).

5

Noble had access to and acknowledged receipt of the Library's policies and guidelines. Included in those guidelines were the Library's Harassment in the Workplace policy. (Noble Dep. Exh. 7, p. 52). In pertinent part, the policy states that the Library does not tolerate bullying, verbal or physical conduct by any staff member which harasses, disrupts, interferes with another's work performance which creates an intimidating, offensive or hostile environment. All staff members must maintain a working environment that encourages mutual respect, promotes civil and congenial relationships among staff members, and is free from all forms of harassment and violence. The policy is attached hereto as Exhibit C. (Doc. 11, Exhibit 7 - Noble Dep. Exh, 7; Noble Dep., p. 52).

Noble admitted that as a security guard he would drive Library motor vehicles. One of the vehicles was a passenger van and the other was a sedan. The passenger van identified itself as a Library vehicle via a large decal attached to it. Further, Noble acknowledged he worked at other branches on occasion as a security guard. (Noble Dep., pp. 66, 72, 75).

Noble testified that the meme in question was posted/shared[1] on his Facebook page. He shared it from someone else's Facebook account. According to Noble, he reposted it at approximately 8:50 p.m., and it was on his Facebook page somewhat less than 24 hours. While Noble asserted that his Facebook page was private so that only his "friends" could view the content of his page, he had more than 50 Facebook friends but probably less than 100. Noble also admitted that his Facebook profile listed him as a Library Public Safety Officer. Further, many of his Facebook friends were Library employees. (Noble Dep., pp. 87-89, 91-94, 105). Noble testified

---

[1] The Public Library uses the words "post" and "share" interchangeably for the purpose of this Motion. The act was essentially the same. Noble saw the meme on another person's Facebook page and took action to place it on his own Facebook page, such that the meme would appear on his profile wall as well as the newsfeed available to his viewers.

6

he removed the posting at the request of his mother without a reason given. He did so. (Noble Dep., pp.102-103).

Noble noted that shortly after he removed the meme from his Facebook page, he received notification to meet with personnel at the Library. At the meeting was Michelle Matthews (Human Resources) and his supervisor, Wei Liu. Noble was given a document/letter placing him on administrative leave. In addition, he was given a copy of the Library Harassment in the Workplace policy. Further, Matthews showed Noble the meme and asked questions about it. Noble admitted he posted the meme. When Matthews asked Noble to explain why he posted the meme, Noble's only response, which he repeated throughout the meeting, was that Noble thought the meme was "funny." (Noble Dep., pp. 110, 112, 114).

Matthews explained to Noble that co-workers reported being scared to come to work and that they had a belief Noble could do harm to them. Noble responded that the post was not up greater than 24 hours, and that he took it down based on the request of a "friend." When asked again, Noble's response regarding the meaning of the meme was that he thought it was "funny." (Noble Dep., p. 112-115).

Approximately one week later, on June 10, 2020, Noble was again called back to the Library and met with Matthews and Liu. Noble was handed a termination letter. (Exhibit D - Doc. 11, Exhibit 13 - Noble Dep. Exh 13). Noble was informed at that time that he had been terminated based on the Facebook post. (Noble Dep., p. 128).

  B.  <u>Testimony of Paula Brehm-Heeger</u>

In 2020, Paula Brehm-Heeger was the Executive Director of the Library. Human Resources Director Kyla Hardin notified Brehm-Heeger of an email she received from a Library team member. (Exhibit E - Doc. 11, Exhibit 10 - Noble Dep. Exh., 10). Hardin received the email from

7

Library employee Ella Mulford. Hardin read Mulford's email to Brehm-Heeger, which email attached Noble's meme. (Deposition of Paula Brehm-Heeger ("Brehm-Heeger Dep.") (Doc. 8), pp. 20-21).

The decision was made to suspend Noble pending an investigation. Based on the meme and resulting investigation, which investigation revealed Noble's conduct constituted a violation of the Library's harassment policy, Brehm-Heeger decided to terminate Noble. Although Brehm-Heeger discussed the termination with Matthews, Hardin, and Liu, along with Molly DeFossey, the Library's Chief Fiscal and Facilities Officer, Brehm-Heeger at no time discussed Noble's termination with the Board or its members. The Board was neither involved nor consulted about the termination. (Exhibit F - Affidavit of Paula Brehm-Heeger; Brehm-Heeger Dep., pp. 25, 28, 33-36).

The reasons for Noble's termination are outlined in Noble's termination letter. (Exhibit D; Brehm-Heeger Dep., p. 30). Brehm-Heeger added,

> Mr. Noble was a public safety office with our Library. Those officers have large discretion, and ability to act with minimal supervision that includes asking customers and community members to leave the Library, thus denying those individuals access to the Library's resources, which is a central part of those individuals' First Amendment rights. Furthermore, Mr. Noble's post, his actions eroded and diminished, substantially, confidence that the senior leadership team in the Library, his managers, co-workers, had in his ability to execute his role fairly and appropriately. Also, he had the capacity to do great harm with the Library's relationship with the diverse communities we serve, as well as making staff feel uncomfortable and unsafe at the Library. Furthermore, it was a violation of our harassment and intimidating behavior policy, as all noted in the letter that was provided to Mr. Noble on June 10 at his termination.

(Brehm-Heeger Dep., pp. 29-30).

  C. <u>Testimony of Kyla Hardin</u>

Kyla Hardin was the Human Resources Director for the Library in 2020. Hardin testified that she received an email from Ella Mulford, who was the manager of the "Popular Library"

8

(fiction). Attached to Mulford's email was Noble's meme in question. (Deposition of Kyla Hardin ("Hardin Dep.") (Doc. 9), pp. 9, 26).

In pertinent part, the email states:

> [M]yself and many of our PLCH staff members were a part of those protests over the weekend, and to have someone in charge of staff and public safety post something so obscene is upsetting. I had multiple staff send me this screenshot, as I am not connected with Mr. Noble on social media. I know we do not have a social media policy, but staff confidence and comfort in this person protecting us and our customers is low.

(Exhibit E).

Hardin described the meme as "disruptive to staff, offensive and creating an intimidating environment." As a result, an investigation took place, including Michelle Matthews and Wei Liu interviewing Noble. Matthews made notes of her meeting with Noble (attached hereto as Exhibit G), which notes were identified as Exhibit H to Hardin's Deposition and produced by Library in discovery. (Hardin Dep., p. 36; Doc. 9, Exhibit 8 - Hardin Dep. Exh. H).

In the notes, which factual outline are admitted by Noble, Noble's only explanation or reason for posting the meme was that he thought it was "funny." (Noble Dep., pp. 114-115). While Noble later tried to justify the meme - after he retained counsel and filed his lawsuit - at his deposition through other disjointed explanation, at no time was the Library was presented with anything other than Noble's explanation that he thought it was "funny." (See Doc. 9, Exhibit 8 - Hardin Dep. Exh. H).

Noble also admitted to Matthews and Liu that Noble shared/reposted the meme, and that he identified himself as on his Facebook profile as a public safety officer for the Library. Noble stated that he removed the meme at the request of a friend. (*Id*.; Noble Dep. pp. 97, 105-106, 125).

It was Hardin's understanding that the meme was posted on June 1. The meeting and suspension of Noble took place on June 2. Thereafter, interviews were conducted of various

9

Library employees, followed by Noble's termination on June 10. Hardin signed the termination letter given to Noble outlining his termination. (Hardin Dep., p. 58).

Hardin recalled discussing the termination with Paula Brehm-Heeger and Michelle Matthews. (Hardin Dep., p. 60).

### D. Testimony of Wei Liu

At the time of the incident with Noble, Wei Liu was the Public Safety Manager for the Library. His responsibilities were for the safety and security of patrons, staff, and the facilities. Eric Noble was one of his reports. (Deposition of Wei Liu ("Liu Dep.") (Doc. 10), pp. 8-9).

Noble's duties were to be in charge of safety and security of the patrons, guests, and staff of the Library. (Liu Dep., p.18). Further, his team members were to patrol the common areas of the Library and be on the lookout for violations of any standards of Library procedure or any code violations. (Liu Dep., pp. 20-21, 30).

Liu interpreted the caricature on the meme. According to Liu, based on his training, he saw protestors being run over by a car - that is murder. (Liu Dep., p. 32). Liu has a bachelor's degree from John Jay College of Criminal Justice. (Liu Dep., p. 7).

Liu participated both in the June 2 and June 10 meetings with Matthews and Noble. Liu's testimony was consistent with the notes taken by Matthews on June 2 at the meeting. (Liu Dep., pp. 35, 38)

### III. Law and Analysis

The law on free speech and the First Amendment is set forth in the recent Sixth Circuit case of *Bennett v. Metropolitan Government of Nashville & Davidson County*, 977 F.3d 530 (6th Cir. 2020). To establish a claim for First Amendment retaliation, a public employee must show that: (1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was

taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements 1 and 2, that is, the adverse employment action was motivated at least in part by the protected conduct. (*Id*.)

To determine whether the discharge of a public employee violates the First Amendment, the Sixth Circuit applies a two-step analysis laid out in *Connick v. Myers*, 461 U.S. 138 (1983*)*. First, the Court must determine whether the statement in question constitutes speech on a **matter of public concern**. *Id*. at 143. Then, if it does, the Court applies the *Pickering* balancing test to determine whether the plaintiff's "interest in commenting upon matters of public concern…outweighs the interest of [Metro] as an employer in promoting the efficiency of the public services it performs through the employees." *Leary v. Daeschner*, 228 F.3d 729, 737 (6th Cir. 2000); *Pickering v. Bd. of Educ*., 391 U.S. 563, 568 (1968).

In the initial analysis required, only when a government employee engages in expressions addressed to "matters of public concern" does the First Amendment protect him from termination. If the speech is not a matter of public concern, it is totally beyond the protection of the First Amendment. *Connick*, 461 U.S. at 147. Where speech does not relate to a matter of public concern, a Federal court will not analyze the reasons for an employer's decision to discipline the worker. Therefore, where an employee's speech is "personal," it is not protected. Where a plaintiff is not attempting to stimulate dialogue on the issue in question, but merely giving vent to anger, or using speech as a weapon, or to make a "funny" observation (even though the speech is not "funny" or is or depicts violence), no balancing is required, because the threshold requirement of speech on a matter of public concern has not been met. See e.g. *Pappas v. Giuliani*, 118 F. Supp. 2d 433, 444 (2000); *Simons v. West Virginia Univ*., 1996 U.S. App. LEXIS 10425 *14.

Against the background of *Connick* and these principles, the Sixth Circuit has distilled the "public concern" test by stating that the court must determine: the "focus" of the speech; "the point of the speech in question"; "to what purpose the employee spoke"; "the intent of the speech"; or "the communicative purpose of the speaker." *See Rodgers,* 344 F.3d at 600 (holding that pertinent inquiry is "the point or focus of the speech in question"); *Taylor v. Keith*, 338 F.3d 639, 645 (6th Cir. 2003) (noting that proper inquiry is the "point of the speech" and "what the speaker intended to communicate"); *Buckley v. City of Portage*, 1999 U.S. App. LEXIS 23254, No. 98-1783, 1999 WL 777542, at *4 (6th Cir. Sept. 16, 1999) (examining "primary focus" of speech), *cert. denied*, 530 U.S. 1262 (2000); *Dambrot v. Central Mich. Univ.*, 55 F.3d 1177, 1187-88 (6th Cir. 1995) (court must look to the "point" of the speech and the "communicative purpose" of the speaker); *Rahn v. Drake Ctr., Inc.*, 31 F.3d 407, 412-13 (6th Cir. 1994) (court must examine "complete record" and determine "focus" of statement for which employee claims protection), *cert. denied*, 515 U.S. 1142 (1995).

As a corollary to this "focus" test, the Sixth Circuit has held that the proper inquiry is *not* what might be "incidentally conveyed" by the speech, and that "passing" or "fleeting" references to an arguably public matter do not elevate the speech to a matter of "public concern" where the "focus" or "point" of the speech advances only a private interest. *See Rodgers*, 344 F.3d at 597-98; *Taylor*, 338 F.3d at 645-46; *Buckley*, 1999 U.S. App. LEXIS 23254, [WL] at *4-5; *Dambrot*, 55 F.3d at 1187; *Rahn*, 31 F.3d at 412-13.

Turning to the employee's speech in the case at bar, viewed in context of the complete record, it is clear that the primary "focus," "point," or "communicative and purpose" of the meme was Noble's own personal "beef" with the protests and protestors. *Farhat v. Jopke*, 370 F.3d 580, 593 (6th Cir. 2004). In fact, his meme - only described to the Library as "funny" - was actually

illustrating violence. Free speech is not, citing a longstanding example, yelling "fire" in a crowded theater or illustrating running over people and "splattering" their lives. Thus, Noble's meme was not a matter of "public concern." Noble knew as much, because he immediately removed the post at his mother's request without any reason necessary. He was not spurring discussion. He did not retort that his meme was an important matter of community interest. Instead, he deleted the meme after the first and only comment upon it. (Noble. Dep., pp. 101-102).

In this case, the meme in question clearly does not rise to the level of "a matter of public concern." Rather, Noble is giving vent to his anger. He is not attempting to stimulate a dialogue on marches or "systems of oppression and racism that may lead to the loss of black life." The Court need only look to Noble's specific response about why he posted the meme and the purpose of it . . . it was "funny." This was his consistent response throughout the meeting between him and the Library. And from Noble's statements, the complaint received, and the interviews, the Library was not dealing with a First Amendment free speech issue.

Further, despite Noble's protestations to the contrary, the meme and what it signifies is clear. The Sixth Circuit added in its review on this initial threshold question in *Bennett*, *supra* that the First Amendment focuses on not only the speaker's interest in speaking, but it also focuses on the public's interest in receiving information. Central to the concept of protecting the speech of government employees is the idea that "public employees are the most likely to be informed of the operations of public employers, and that the operation of each entity is of substantial concern to the public." See *Bennett,* 977 F.3d at 538-539 ("The Supreme Court described the "employee-speech jurisprudence" as "acknowledg[ing] the importance of promoting the public's interest in receiving the *well-informed* views of government employees engaging in civic discussion.")

13

There is no interest in the public receiving the information in Noble's meme. It does not open "discussion." Therefore, Noble's right to "comment on the matter depicted" is not protected by the First Amendment, and he recognizes it when he candidly admitted in his meeting with the Library that he simply thought it was "funny." Other Library employees certainly did not.

If the Court needed to go further, which it does not, to apply the *Pickering* test (only assuming the speech is of public concern), the Court must determine whether the employee's free speech interests outweigh the efficiency interests of the government employer. The application of the *Pickering* balancing test is a matter of law for the court to decide. *Gillis v. Miller*, 845 F.3d 677, 684 (6th Cir. 2017). The pertinent considerations for the balancing test are whether the statement (a) impairs discipline by superiors or harmony among coworkers; (b) has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary; (c) impedes the performance of the speaker's duties or interferes with the regular operations of the enterprise; or (d) undermines the mission of the employer. See *Rogers v. Banks*, 344 F.3d. 587, 602 (6th Cir. 2003). The consideration of the employee's performance, impaired discipline by supervisors, harmony among coworkers, and undermining of the office's mission is focused on the effective functioning of the public employer's enterprise.

Analysis of the balancing test leads to the inescapable conclusion that Noble's alleged free speech interest is clearly and substantially outweighed by efficiency interests of the Library. Noble's job is to be a security guard - protecting the safety and wellbeing of his colleagues as well as the general public. He is also to drive Library vehicles for services provided by the Library, and go to outlying branches driving the vehicles on company time. He is given independent responsibility and total discretion to unilaterally take actions against members of the public, including removing them from the premises, revoking or suspending patrons' access to Library

facilities, and in extreme circumstances, physically engaging with members of the public. Noble's meme caused him to lose the confidence of the Library and his co-workers. There was a direct and impending fear Noble could not fairly and appropriately wield his authority. Co-workers expressed concern over his presence and their safety. As noted in the Library's termination letter to Noble, his actions had the capacity to do significant harm to the Library's relationship with the diverse communities it serves.

No doubt Noble will try and argue he was a good employee with positive reviews, he was "rookie of the year," and some of the interviewees would apparently continue to try and work with him. And why not progressive discipline? Because the meme and actions of Noble were extremely serious and terminable and the Library cannot and will not tolerate threats of violence by the very person who is entrusted to ensure community and staff safety.

Moreover, the meme depicts a vehicle violently hitting protesters causing their "lives to splatter," protests were occurring right outside the Library, co-workers and members of the general public attended the protests, and Noble DRIVES LIBRARY VEHICLES as an employee. The Library does not have to wait for actual disruption of the workplace (even though it occurred as evidenced in Mulford's email), but may instead fire an employee based on a reasonable prediction of disruption. See *Anzaldua v. N.E. Ambulance and Fire Protection District*, 793 F.3d. 822, 834 (8th Cir. 2015). The Library did not have to wait for Noble to run over his colleagues with a van before terminating him for his blatant and horrific threats, regardless of how "funny" Noble thought it might be. The current and tragic events in Waukesha tell us as much.

Finally, the Board and its members had no input and were not consulted about Noble's termination. They should be summarily dismissed even before consideration of the merits, or lack thereof, of Noble's First Amendment claims.

## IV. Conclusion

For all the reasons above, the Public Library (all Defendants) is entitled to summary judgment as a matter of law.  Reasonable minds can only conclude that there is no material facts at issue and the Public Library is entitled to dismissal of Plaintiff's Complaint in its entirety.

        */s/ Felix J. Gora*
Felix J. Gora (0009970)
Megan E. Mersch (0095428)
RENDIGS, FRY, KIELY & DENNIS, LLP.
600 Vine Street, Ste. 2650
Cincinnati, Ohio 45202
513-381-9200-Phone
513-381-9206-fax
fgora@rendigs.com
mmersch@rendigs.com
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this the 1st day of December, 2021, a copy of the foregoing was filed electronically thought the Court's CM/ECF system which shall serve electronically a copy upon all counsel of record.

        */s/ Felix J. Gora*
Felix J. Gora

2648272