**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **ERIC NOBLE,** | : | Case No. 1:20-cv-594 |
| | : | |
| **Plaintiff,** | : | Judge: Michael R. Barrett |
| | : | |
| v. | : | |
| | : | |
| **THE PUBLIC LIBRARY OF** | : | **PLAINTIFF'S MOTION FOR** |
| **CINCINNATI AND HAMILTON** | : | **SUMMARY JUDGMENT** |
| **COUNTY,** *et al.*, | : | |
| | : | |
| **Defendants.** | : | |

Now comes Plaintiff Eric Noble, by and through his undersigned legal counsel, and pursuant to Fed. R. Civ. P. 56, moves for summary judgment as to his claims for unlawful retaliation with the exercise of his rights to free speech under the First Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983 and for declaratory judgment pursuant to 28 U.S.C. § 2201, *et seq.* A Memorandum in Support of the Motion is attached herewith.

    Respectfully submitted,

    */s/ Matthew S. Okiishi*
    Matthew S. Okiishi (0096706)
    Stephen E. Imm (0040068)
    Finney Law Firm, LLC
    4270 Ivy Pointe Blvd., Suite 225
    Cincinnati, OH 45245
    (513) 943-6659
    (513) 943-6669-fax
    matt@finneylawfirm.com
    stephen@finneylawfirm.com
    *Attorneys for Plaintiff*

## **MEMORANDUM IN SUPPORT**

I. **UNDISPUTED MATERIAL FACTS**

A. **Mr. Noble begins his employment with the Public Library of Cincinnati and Hamilton County and is consistently regarded as a great employee.**

Mr. Noble was appointed to the position of Security Guard for Defendant Public Library of Cincinnati and Hamilton County (the "Library") on February 25, 2018. (Deposition of Wei Liu ("Liu Depo."), Doc. 10, PAGEID 234.) The Library is a public library located in the City of Cincinnati and Hamilton County, Ohio, and as such, Mr. Noble was for all relevant times a public employee. (Doc. 2, PAGEID 11; Doc. 3, PAGEID 18.) Mr. Noble was employed in the Library's Public Safety Department, where he reported directly to Wei Liu, Public Safety Manager, and was assigned to patrol the Main Library in Downtown Cincinnati. (Liu Depo., Doc.10, PAGEID 232-234; 236.) On occasion, he would be deployed to other locations "as needed" depending on the nature of incidents at locations. (Liu Depo., Doc. 10, PAGEID 236.)

Throughout his employment, Mr. Noble received excellent employment reviews. His 30-, 60-, and 90-day reviews all received positive marks from Mr. Liu. (Liu Depo., Doc. 10, PAGEID 13-14; Deposition of Kyla Hardin ("Hardin Depo."), Doc. 9, PAGEID 126.) In his 90-day review, Mr. Liu noted that Mr. Noble "continually engaging patrons, even those who are disruptive, along with staff members with 'zest,'" meaning that he was enthusiastic in engaging with members of the public and his colleagues. (Liu Depo., Doc. 10, PAGEID 238-239.) In that same evaluation, Mr. Noble was described as respectful, compassionate, and empathetic with customers. (*Id.*)

In Mr. Noble's performance review for calendar year 2018, he received exceptional marks, and received the Rookie of the Year Award. This award is nomination-only and is given to first-year staff members who "perform extraordinarily well." (Liu Depo., Doc. 10, PAGEID 240.) The Rookie of the Year Award is not given out to every first-year employee. (Hardin Depo., Doc. 9,

PAGEID 125.) In Mr. Noble's performance review for calendar year 2019, he again received marks of "exceptional performer," a distinction reserved for 15 to 20 percent of employees. (Hardin Depo., Doc. 9, PAGEID 127-129; Liu Depo., Doc. 10, PAGEID 241-242.)

Consistent with his exceptional performance, from his hire through June 1, 2020, Mr. Noble had no complaints from his coworkers, supervisors, or the general public in his employment file. (Hardin Depo., Doc. 9, PAGEID 129).

### B. Mr. Noble's job duty was to apply unambiguous Library rules at the Main Library and whenever he was called to a different branch.

Mr. Noble's primary job duty was to enforce the Standards of Library Behavior. (Liu Depo., Doc.10, PAGEID 244.) These standards prohibited: panhandling; improper use or destruction of library resources; disruption or interfering with normal operations, including loud voices or use of equipment at a loud volume; unauthorized petitioning; bringing in non-service animals; consumption of food or drink in undesignated areas; interfering with ingress or egress; excessive luggage, defined as more than five cubic feet; sleeping; entering without a shirt or shoes; and offensive odor or pests. (Liu Depo., Doc. 10, PAGEID 246-253.)

Mr. Noble did not have the discretion to create his own rules or policies, and if he had ejected someone from the Library under an idiosyncratic or ad hoc rule, the matter would have been escalated to human resources. (Liu Depo., Doc. 10, PAGEID 244-245.) Throughout his employment, Mr. Noble never documented exceeded the bounds of his authority. (Liu Depo., Doc. 10, PAGEID 254; Hardin Depo., Doc.9, PAGEID 129.)

While Mr. Noble could use a Library vehicle to go from one branch location to another, or to transport persons, he could only do so after being instructed to do so and would sign for the vehicle. (Liu Depo., Doc. 10, PAGED 258; Deposition of Eric Noble ("Noble Depo."), Doc. 11,

3

PAGEID 363, 365-368.) As a result, the vast majority of his rounds were performed on foot. (Liu Depo., Doc. 10, PAGEID 258.)

### C. **Mr. Noble, on his own free time and off of Library premises, posts a Facebook meme with the intention of commenting on the then-ongoing racial justice protests.**

On May 29, 2020, while off work and off duty, Mr. Noble reshared a meme on Facebook to comment on the then-ongoing racial justice protests in Cincinnati and throughout the nation. (Noble Depo., Doc. 11, PAGEID 413-414.; Hardin Depo., Doc. 9 Exhibit G, PAGEID 208-209; Brehm-Heeger Depo., Doc. 8, PAGEID 79.) The posting contained a depiction of a vehicle hitting stick figure people with the captions "All lives splatter" and "Nobody cares about your protest." (Hardin Depo., Doc. 9, PAGEID 137-138.)

Mr. Noble made his posting because he did not care about the protests, and thought the meme succinctly expressed his view that "when you start breaking the law or stopping traffic or destroying property, I don't agree that it's a protest anymore." (Noble Depo., Doc. 11, PAGEID 413-414.)

On its face, the post did not state that he was going to run over individuals with his car or deny Library access to any individuals. (Deposition of Paula Brehm-Heeger ("Brehm-Heeger Depo."), Doc. 8, PAGEID 74, 79; Hardin Depo., Doc. 9, PAGEID 133.) He did not "tag" any Library employees in his post, nor did he comment or make reference to any employees of the Library in his post. (Hardin Depo., Doc. 9-7, PAGEID 209; Hardin Depo., Doc. 9, PAGEID 134; Brehm-Heeger Depo., Doc. 8, PAGEID 65.) No Library staff reported seeing Mr. Noble's post while they were at any protest.

On June 1st, coworker Elle Mulford sent an email to Kyla Hardin, Human Resources Director, with a screenshot of Mr. Noble's posting to complain about its existence. (Hardin Depo., Doc. 9, PAGEID 130, 138.) Ms. Mulford's email alleged that Mr. Noble posted the meme "over

4

the weekend," that she and other employees of the Library were present at the protest, and that the post was "upsetting" because it was "obscene." (Hardin Depo., Doc.9-7, PAGEID 208-209.)

On June 2nd, Mr. Noble had a meeting with Human Resources Manager Michelle Matthews and his supervisor, Wei Liu, to discuss his posting. (Hardin Depo., Doc. 9, PAGEID 139; Noble Depo., Doc. 11, PAGEID 406.) In the meeting, Mr. Noble asserted that he was not on the job, had a First Amendment right to free speech, and that the post was only up for 24 hours. (Liu Depo., Doc. 10, PAGEID 262; Hardin Depo., Doc. 9, PAGEID 140; Noble Depo., Doc. 11 PAGEID 419, 423.) At the conclusion of the meeting, Ms. Matthews presented Mr. Noble with a letter informing him that he was being placed on leave "effective immediately" while the Library investigated alleged violations of the "Harassment in the Workplace Policy. (Hardin Depo., Doc. 9-11, PAGEID 222.)

The Library's subsequent investigation interviewed four employees: Michael Guess, Greg Stahl, Christina Morris (who worked in the Public Safety Department with Mr. Noble) and Correna Kuhl. (Hardin Depo., Doc.9-8, PAGEID 210-217; Doc. 9, PAGEID 155.) No one asserted that they could no longer work with Mr. Noble. (Hardin Depo., Doc. 9, PAGEID 153-155; Doc. 9-8, PAGEID 211, 213). Moreover, Mr. Guess and Mr. Stahl voiced their understandings of the meaning behind Mr. Noble's post. Mr. Guess found it to mean that Mr. Noble "didn't give a care about the protestors" and to "get out of my way." (Hardin Depo., Doc. 9, PAGEID 152; Doc. 9-8, PAGEID 211). Mr. Stahl interpreted the message as "an indictment of everything that is going on right now" and took it as "f--- those people." (Hardin Depo., Doc. 9, PAGEID 154; Doc. 9-8, PAGEID 213.)

Hardin and Brehm-Heeger discussed terminating Mr. Noble, and being so agreed, terminated him on June 11, 2020. (Hardin Depo., Doc. 9, PAGEID 139, 162; Brehm-Heeger,

5

Doc.8, PAGEID 68.) He was presented with a letter announcing his termination for a litany of reasons, including loss of staff confidence, coworker concerns that his presence may jeopardize their safety, potential damage to the community, and a violation of the Library's policy against harassing, intimidating, and offensive conduct. (Hardin Depo., Doc. 9-12, PAGEID 223.) At the time of his termination, the Library did not maintain a social media policy. (Hardin Depo., Doc. 9-7, PAGEID 208-209; Declaration of Eric Noble, Doc. 13-1, ¶5.) On August 11, 2020, The Board of Trustees for the Library approved Mr. Noble's "personnel change" as a consent agenda item. (Declaration of Eric Noble, Doc.13-1, ¶8.)

At the time of his termination, the only other employee who had been terminated for violating posts to social media had sent explicit threats to a coworker through Facebook Messenger. (Hardin Depo., Doc. 9, PAGEID 115.) Furthermore, no member of the public had complained about Mr. Noble's post. (Hardin Depo., Doc.9, PAGEID 167; Liu Depo., Doc. 10, PAGEID 260; Brehm-Heeger Depo., Doc. 8, PAGEID 79.)

## II. LAW & ARGUMENT

### A. Legal Standards

Summary judgment is appropriate where the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)(2); *Hernandez-Butler v. IKEA U.S. E., LLC*, 435 F. Supp. 3d 816, 821 (S.D. Ohio 2020). In evaluating a motion for summary judgment, the Court views the facts in the light most favorable for the nonmoving party and draws all reasonable inferences in favor of the nonmoving party. *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 242 (6th Cir. 2015); *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003). The Court does not weigh the evidence, judge the credibility of witnesses, or determine

the truth of the matter; it only determines whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

B. **Mr. Noble is entitled to summary judgment on his free speech retaliation claim, as there is no genuine dispute of material fact, and he is entitled to same as a matter of law.**

1. **Elements of a First Amendment retaliation claim.**

42 U.S.C. § 1983 exists to deter state actors (such as the Defendants in this action) from using their authority to deprive individuals of their federally guaranteed rights and to provide relief to the victims should that deterrence fail. *Wyatt v. Cole*, 504 U.S. 158, 161 (1992).

For a public employee to establish a claim of First Amendment retaliation (and thus deprived of a right secured under federal law) within 42 U.S.C. § 1983, he must demonstrate that (1) he was engaged in a constitutionally protected activity; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the action was motivated at least in part as a response to the exercise of his constitutional rights. *Cockrel v. Shelby County Sch. Dist.*, 270 F. 3d 1036, 1048 (6th Cir. 2001). For purposes of the first prong, a public employee's speech is protected by the First Amendment if it is (1) made as a private citizen; (2) involved a matter of public concern; and (3) if his interest in speaking outweighs the efficiency interests of the government as an employer. *Marquardt v. Carlton*, 971 F. 3d 546, 549 (6th Cir. 2020).

2. **Mr. Noble's speech was protected by the First Amendment.**

a. *Mr. Noble spoke as a private citizen on a matter of public concern.*

When a public employee speaks outside of the ordinary responsibilities of his employment, he speaks as a citizen for First Amendment purposes. *Barrow v. City of Hillview*, 775 Fed. Appx. 801, 814 (6th Cir. 2019). It is undisputed that at the time Mr. Noble made his Facebook post, he

did so while he was off work, off duty, and not as a requirement of his job. (Hardin Depo., Doc. 9, PAGEID 144-145.) As such, he was clearly speaking as a private citizen.

"Speech involves a matter of public concern when it can be "fairly considered as relating to any matter of political, social, or other concern to the community." *Marquardt*, supra, 971 F.3d at 549. In analyzing whether speech touches on a matter of public concern, courts look to the "content, form, and context of a given statement, as revealed by the whole record." *Handy-Clay*, supra, 695 F.3d at 543. In this case, Mr. Noble's speech, by way of his Facebook post, was made contemporaneously with the then-ongoing protests that took place in Cincinnati and elsewhere during the late spring and early summer of 2020 to protest the deaths of George Floyd and other persons of color. These protests raised obvious social and political concerns. See e.g. *Alsada v. City of Columbus*, Case No. 2:20-cv-3431, 2021 U.S. Dist. LEXIS 82759, *75 (S.D. Ohio, Apr. 30, 2021) (noting that the protests have sparked at least seventy-three cases which "shine a light on existing First Amendment and Fourth Amendment principles.") His speech specifically addressed the protests, facially stating that "nobody cares" about a "stupid protest." (Hardin Depo., Doc. 9, PAGEID 137-138.) Moreover, his speech was interpreted by those who saw it as addressing the protests, albeit not in a way they would necessarily agree with. (Hardin Depo., Doc. 9, PAGEID 152, 154; Doc. 9-8, PAGEID 211, 213.)

The fact that Defendants' witnesses characterized Mr. Noble's speech as violent, obscene, or upsetting does not manipulate his posting into a matter of private concern (Hardin Depo., Doc. 9-7, PAGEID 208.) As a matter of law, the shocking and even painful feelings his speech may have inspired in his coworkers is "irrelevant to whether it concerns a public matter." *Marquardt*, supra, 971 F.3d at 549 (citing *Rankin v. McPherson*, 483 U.S. 378, 387 (1983)). Nor does the fact that Mr. Noble's post was made to a Facebook account with limited access solely to his friends

8

render it a private concern. (Noble Depo., Doc. 11, PAGEID 391.) Rather, the fact that the speech was made on Facebook at all places it into the realm traditionally occupied by the public square. *Marquardt*, supra, 971 F.3d at 551 (citing *Packingham v. North Carolina*, 137 S. Ct. 1730, 1732 (2017)).

Furthermore, Mr. Noble's speech is not neutered by the fact that he only articulated that the posting was "funny" in his interview. (Noble Depo., Doc. 11, PAGEID 412.) A public employer may not divorce a statement made by an employee from its context by requiring the employee to repeat the statement, and use that statement standing alone as basis for a discharge. *Rankin v. McPherson*, 483 U.S. 378, 387, fn. 10 (1987) (cautioning that such a tactic "could in some cases merely give the employee the choice of being fired for failing to follow orders or for making a statement which, out of context, may not warrant the same level of First Amendment protection it merited when originally made.")

Mr. Noble's speech did not contain any slurs or references to race. It did not directly threaten a protester or coworker, and at no point was it editorialized to raise idiosyncratic concerns such as complaining about his commute or day being disrupted. (Hardin Depo., Doc. 9-7, PAGEID 209.) Rather, it expressed his apathy and disapproval with the protests underway at the time and was interpreted in that manner. (Noble Depo., Doc. 11, PAGEID 413-414; Hardin Depo., Doc. 9, PAGEID 152, 154; Doc. 9-8, PAGEID 211, 213.) As such, consistent with Supreme Court and Sixth Circuit precedent, the speech did not merely "touch" on a matter of public concern—it was cloaked in it entirely.

> b. *Mr. Noble's interest in speaking on a matter of public concern outweighs the efficiency interests of the government as an employer, and as such, he engaged in constitutionally protected speech.*

Because Mr. Noble spoke as a citizen on a matter of public concern, the Court must balance his interests, "as a citizen in commenting on matters of public concern," and Library's efficiency

9

interests as an employer. *Handy-Clay*, 695 F. 3d 531, 544 (6th Cir. 2012).; *Marquardt*, supra, 971 F.3d 549. In performing this balancing, Mr. Noble's speech is not viewed in a vacuum, it is instead viewed in its time, manner, place of expression, and context. *Pucci v. Nineteenth Dist. Court*, 596 Fed. Appx. 460, 470 (6th Cir. 2015) (for convenience cited hereinafter as "*Pucci II"*); *Rankin v. McPherson*, 483 U.S. 378, 389 (1987). As Mr. Noble's speech, at a minimum, substantially commented on a matter of public concern by addressing ongoing social justice protests, the Library and Defendants are required to make a "particularly strong showing" that his speech interfered with workplace functioning before taking action. *Pucci II*, supra, 596 Fed. Appx. at 470. They cannot do so.

In considering the Defendants interests as an employer, the Court considers, among other things, whether Mr. Noble's speech meaningfully interfered with the performance of his duties, undermine a legitimate goal of the employer, create disharmony among co-workers, impair discipline by superiors, or destroy the relationship of loyalty and trust required of confidential employees. *Id.* (citing *Rodgers v. Banks*, 344 F. 3d 587, 596 (6th Cir. 2003)). Defendants bear the burden of showing "a legitimate justification for discipline." *Murphy v. Cockrell*, 505 F.3d 446, 452 (6th Cir. 2007).

After placing Mr. Noble on administrative leave for his speech, Defendants engaged in an investigation to find the extent of the harm he had caused, ostensibly under the Library's harassment policy. (Hardin Depo., Doc. 9, Exhibit K, PAGEID 222.) This investigation eventually concluded that his speech had caused a "loss of staff confidence in his ability to fairly and appropriately" enforce library policy, "coworker concerns that his presence may jeopardize their safety," "potential damage to the community," and also happened to be a "violation of the

10

Library's policy against harassing, intimidating, and offensive conduct." (Hardin Depo., Doc. 9, Exhibit L, PAGEID 223.)

> i. <u>Defendants' articulated interest in terminating Mr. Noble because of coworker concerns that he jeopardized their safety is without merit. There is no basis to presume that a single Facebook post to a private account, that went neither viral nor to the local news, had any possibility of damaging relationships within the community.</u>

But rather than bolster their stated reasons for terminating Mr. Noble, Defendants' investigation undermines them. Defendants' investigation notes, made and maintained as the result of a regular business activity, show that his coworkers within the Public Safety Department did not claim that they could not work with Mr. Noble going forward and did not demand his termination. (Hardin Depo., Doc. 9, PAGEID 153-155.) No employee reported feeling harassed or threatened by Mr. Noble's post. (Hardin Depo., Doc. 9, PAGEID 132, 147-149, 157.) No one even reported seeing it while they were protesting. (Hardin Depo., Doc. 9, PAGEID 138.) The investigation notes lack any evidence showing that any employees felt that his presence was a threat to their safety, as asserted in the termination letter. This purportedly "legitimate justification" is simply made of whole cloth.

Nor is there any evidence in the record to support Defendants' assertion that Mr. Noble's post had the potential to "harm the Library's relationship with the diverse communities" it served. To a person, not one of Defendants' witnesses could recall a single incident following Mr. Noble's exercise of his free speech rights where a member of the public complained about his posting. (Hardin Depo., Doc.9, PAGEID 167; Liu Depo., Doc. 10, PAGEID 260; Brehm-Heeger Depo., Doc. 8, PAGEID 79.) And why would they? From an exposure standpoint, Mr. Noble's post was only visible on his private Facebook for a mere 24 hours. (Noble Depo., Doc. 11, PAGEID 424.) It utilized no slurs, no mentions of race, and no call for immediate action. It did not go viral. Crass as it was, his posting was one that would cause well-constituted observers to either scoff at its

11

ignorance, chuckle at its humor, or simply ignore it all together.[1] While his speech certainly stirred the passions of his *coworkers* who decided to exercise their First Amendment rights to protest, (a right Mr. Noble voiced support for even as he was being suspended), it was specious to assume that the broader community would have even cared.

> ii. <u>Defendants' articulated interest in terminating Mr. Noble because he staff purportedly lost confidence in his ability to enforce Library policies fairly and appropriately is not substantiated by his employment history, reasonable conjecture, or his conduct during the protests.</u>

Defendants further articulated that staff had "lost confidence in his ability to fairly and appropriately enforce Library policies." (Hardin Depo., Doc. 9-12, PAGEID 223.) But again, the interview notes, along with Mr. Noble's nonviolent conduct during the protests, undermine this assertion. It is beyond dispute that prior to his exercise of his First Amendment rights, Mr. Noble was universally regarded as a "good" employee according to the deposition testimony. (Liu Depo., Doc. 10, PAGEID 242; Brehm-Heeger Depo., Doc. 8, PAGEID 84-85.) His evaluations demonstrate that he was excellent. He was commended by his supervisor, Wei Liu, for engaging patrons, even those who are disruptive, along with staff members, with "zest." (Liu Depo., Doc.10, PAGEID 238-239.) He was described as "respectful, compassionate, and empathetic with customers." (*Id.*) In both of his annual performance reviews, he received "exceptional marks" and was presented with the Library's Rookie of the Year Award. (Liu Depo., Doc. 10, PAGEID 240-242.) Consistent with his superb evaluations, there was not a single complaint from *anyone* in his employment file prior to his speech, and Liu had never flagged an ejection overseen by Mr. Noble.

---

[1] The maker of the screenshot did so at 1:41 PM based on the timestamp at its top, and Mr. Noble's post occurred the day before at 8:50 PM based on its timestamp. Despite having been shared at least 16 hours prior to the screenshot, most people who saw it chose not to interact with it, with the exception of a lone individual who "reacted" with a "ha-ha." (Hardin Depo., Doc. 9-7, PAGEID 208.)

12

(Liu Depo., Doc. 10, PAGEID 243.) Moreover, when he was asked about Mr. Noble's performance during the investigation, Mr. Liu noted his good job performance! (Liu Depo., Doc. 10, PAGEID 265.)

Defendants' assertion that Mr. Noble could no longer perform his duties in a nondiscriminatory fashion is supported only by the interview comments of non-supervisory employees. To give weight to these baseless accusations requires a willful ignorance of the fact that Mr. Noble had at all times acted with the poise and decorum befitting of his position. (Hardin Depo., Doc. 9, PAGEID 129; Liu Depo., Doc. 10, PAGEID 272.) It also implicitly presumes that one's objection to the protests is as indicative of racism as a burning cross and pointed hood, despite Mr. Noble's objectively race-neutral post.

Defendants' position also misses the glaringly obvious fact that despite having easy access to his own personal vehicle, Mr. Noble did not go near the protests, much less attempt to hit anybody with his car, instead exercising his First Amendment right, like his coworkers and other concerned citizens. This proffered interest, like the others previously discussed, stands naked.

      iii. <u>Defendants' articulated interest in terminating Mr. Noble because of his conduct constituted "harassment" is without merit.</u>

The final stated reason for Mr. Noble's termination is his purported violation of the Library's harassment in the workplace policy. (Hardin Depo., Doc. 9-7, PAGEID 223.) The policy reads, in pertinent part:

> The Public Library of Cincinnati and Hamilton County does not tolerate bullying, verbal or physical conduct by any staff member which harasses, disrupts, or interferes with another's work performance or which creates an intimidating, offensive, or hostile environment. (Hardin Depo., Doc. 9-9, PAGEID 218.)

In determining that Mr. Noble's speech violated this policy, Defendants relied upon the notions that Mr. Noble's speech: "offended and upset" staff so as to create an offensive environment; caused employees to complain, rendering it "disruptive" and "interfered with work performance;"

13

and that staff reported "feeling unsafe." (Hardin Depo., Doc. 9, PAGEID 136-137, 141; Brehm-Heeger Depo., Doc. 8, PAGEID 77.) But these tenuous assertions are not sufficient as a matter of law. Defendants must be able to demonstrate that the speech caused such an uproar or disturbance that it "caused tasks to go undone, work quality to lapse, or the public confidence in the [Library] to wane," or otherwise meaningfully interfered with Library operations. *Pucci II*, supra, 596 Fed. Appx. at 471. They cannot do so.

An objective review of Defendants' harassment policy in light of the facts and circumstances present in the record shows that Mr. Noble's single Facebook post could not reasonably be interpreted to be in violation of the policy. Mr. Noble's speech did not contain any slurs or references to race. His post was not addressed directly to any coworkers, nor was it sent to them. (Hardin Depo., Doc. 9, PAGEID 134.) As such, no employee reported feeling harassed or threatened by Mr. Noble's post. (Hardin Depo., Doc. 9, PAGEID 132, 147, 149-148, 157.) And coworkers within the Public Safety Department did not claim that they could not work with Mr. Noble going forward and did not demand his termination. (Hardin Depo., Doc. 9, PAGEID 153-155.)

Not only does Mr. Noble's statement fall short of violating the Library's harassment policy under an objective analysis, but it also falls woefully short of meeting the legal standard for harassment within the workplace. Workplace harassment, as a matter law, must be so severe and pervasive as to create an "objectively hostile or abusive work environment" and cause the purported victims to "subjectively perceive the environment to be abusive." *EEOC v. Harbert-Yeargin, Inc.*, 266 F. 3d 498, 508 (6th Cir. 2001) (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993)). This requires an examination of all surrounding circumstances including the frequency of the conduct, its severity, whether it is physically threatening or humiliating as compared to "a

14

mere offensive utterance," and whether it unreasonably interferes with an employee's work performance. *Id*. This analysis is viewed from what a reasonable person would find hostile or abusive. *Id.* at 506-507. The abovementioned and undisputed facts surrounding Mr. Noble's speech demonstrates that a reasonable employer could not have found it to pose a risk of actionable—let alone a good faith claim for—harassment on any basis. See *Carruthers v. McCarthy*, 817 Fed Appx. 88, 89 (6th Cir. 2020) (cleaned up) (an employer is under no duty to act against groundless complaints of misconduct.)

At best, the investigation shows that Mr. Noble's speech led to "mere disharmony" insufficient for Defendants interests to outweigh his right to speak on a matter of public concern. *Pucci II*, supra, 596 Fed Appx. at 471-472; see also *Rodgers v. Banks*, 344 F.3d 587, 602 (6th Cir. 2003) ("[W]e have never held that the relatively minor associated risk of disharmony… would ordinarily overcome" a free speech interest.) Moreover, this "mere disharmony" is the result of nothing more than the kind of private speech that takes place at all levels of the workplace and society. The notion that Mr. Noble's single posting on a matter of public concern (which was viewable on his page for one day) disrupted the workforce, or otherwise undermined the Library's operations, "borders on the fanciful." *Rankin*, supra, 483 U.S. at 393 (Powell, J., concurring.)

> iv. <u>The sole interest the Defendants sought to advance in investigating and terminating Mr. Noble was to silence speech with which they did not agree.</u>

Mr. Noble's speech did not hamper the Library's public functions; the Covid-19 Pandemic did. (Brehm-Heeger Depo., Doc. 8, PAGEID 74-75.) His speech was not devoid of meaning, as two interviewed employees did interpret it to be a statement of either disapproval or apathy. (Hardin Depo., Doc. 9, PAGEID 152, 154; Exhibit H, PAGEID 211, 213.) By utilizing an internet meme and a pun on the slogan "All Lives Matter," Mr. Noble exercised his First Amendment right to participate in the discourse surrounding the protests.

During the relevant time period, the Library did not behave like a neutral agency. It instead chose to, through its Director and marketing team, inject itself vigorously into the debate surrounding police brutality and systemic racism. On the same day that the Library began its sham investigation into Mr. Noble's Facebook post, Defendant Paula Brehm-Heeger, Director of the Library, published a letter in support of the protests that Mr. Noble criticized. (Brehm-Heeger Depo., Doc. 8-2, PAGEID 94-97.) The Library also updated its own social media pictures to a solid black background and stated that it did so to "stand in solidarity against the systems of oppression and racism that routinely lead to the loss of Black life, such as the murder of George Floyd, Ahmaud Arbery, and countless others." (Brehm-Heeger Depo., Doc. 8-1, PAGEID 93.)

Because the Library inserted itself into the debate, examining the purported interests of Defendants requires vigilance to ensure that the Defendants did not use their authority over employees to silence discourse simply because superiors disagree with the content of the speech. *Rankin*, supra, 483 U.S. at 385. Mr. Noble was able to adhere to this principle and he did so by acknowledging that his colleagues had the right to protest while he was being placed on suspension. (Hardin Depo., Doc. 9, PAGEID 140.)

Ms. Mulford's complaint took issue with Mr. Noble's "obscenity" and made a passing (and anecdotal) reference to "staff confidence" before largely digressing into issues that did not—and could not—have been the fault of Mr. Noble, i.e. a staff member being struck by a rubber bullet, her inability to separate her personal and professional life, deteriorating faith in the Cincinnati Police Department, and a general wariness of people in charge. (Hardin Depo., Doc. 9-7, PAGEID 208.) Despite its general idiosyncrasy, (and the fact that Ms. Mulford did not see the post while at the protest), it sparked an immediate and unconstitutional reaction from her sympathetic superiors. But in her deposition testimony, Hardin admitted that had Mr. Noble made a similar complaint

about his coworkers' antipathy towards supporting the police, she would not have investigated it under the workplace harassment policy if the speech or protest was "not on work time." (Hardin Depo., Doc. 9, PAGEID 144.) Clearly it was Mr. Noble's *viewpoint* that bothered her.

The reality of this case is that the articulated positions of the Defendants, as they pertain to Mr. Noble's speech and balancing of interests, cannot be divorced from their blatant and unconstitutional attempt to impose their "correct" worldview. For if "there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics…or other matters of opinion…" See *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (Jackson, J.)

### 3. A reasonable jury could only conclude that Mr. Noble's termination would deter a person of ordinary firmness from exercising his free speech rights, and that his termination was motivated, at least in part, by the exercise of his rights.

Because Mr. Noble has satisfied the first element of his §1983 claim, the Court considers the remaining two elements: whether his adverse action would deter a person of "ordinary firmness from exercising his First Amendment rights; and whether his termination was motivated, at least partially, by the exercise of his rights. *Cockrel*, supra, 270 F. 3d at 1048. There can be no reasonable dispute that Mr. Noble suffered an adverse action in the forms of his suspension without pay and subsequent termination. The fact that he was ultimately terminated is an obvious deterrent against a person of ordinary firmness from continuing to engage in the conduct for which he was fired. *Pucci v. Nineteenth Dist. Court ("Pucci I")*, 628 F.3d 752, 769 (6th Cir. 2010) (citing *Cockrel*, supra, 270 F. 3d at 1055). As a result, Mr. Noble satisfies the second prong of the analysis.

As to the third prong, no reasonable juror could possibly find that Mr. Noble's termination was not motivated, at least in part, by his exercise of his First Amendment rights. Every step of Defendants' retaliation was the result of it, from investigation to termination. (Hardin Depo., Doc.

17

9-11, PAGEID 222; Doc. 9-12, PAGEID 223.) Notwithstanding the speech, Mr. Noble was in an elite tier of employee, universally regarded as an "excellent performer" as rated by his supervisor. (Hardin Depo., Doc. 9, PAGEID 127-129; Liu Depo., Doc. 10, PAGEID 241-242.) As such, a jury could only find that Mr. Noble would have not been terminated but for his speech.

### C. Conclusion

In light of the foregoing, Plaintiff Eric Noble respectfully requests that the Court grant summary judgment in his favor as to all counts.

Respectfully submitted,

*/s/ Matthew S. Okiishi*
Matthew S. Okiishi (0096706)
Stephen E. Imm (0040068)
Finney Law Firm, LLC
4270 Ivy Pointe Blvd., Suite 225
Cincinnati, OH 45245
(513) 943-6659
(513) 943-6669-fax
matt@finneylawfirm.com
stephen@finneylawfirm.com
*Attorneys for Plaintiff*

## **CERTIFICATE OF SERVICE**

I certify that on December 1, 2021, a true and accurate copy of the foregoing was filed electronically through the Court's CM/ECF system which shall serve electronically a copy upon all counsel of record.

<em>/s/ Matthew S. Okiishi</em><br>
Matthew S. Okiishi (0096706)