**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| **ERIC NOBLE,** | : Case No.  1:20-cv-00594 |
| | : |
| **Plaintiff,** | : |
| | : **Judge Michael R. Barrett** |
| **v.** | : |
| | : |
| **THE PUBLIC LIBRARY OF CINCINNATI** | : **DEFENDANTS' MEMORANDUM IN** |
| **AND HAMILTON COUNTY, et al.,** | : **OPPOSITION TO PLAINTIFF ERIC** |
| | : **NOBLE'S MOTION FOR SUMMARY** |
| **Defendants.** | : **JUDGMENT** |
| | : |

COME NOW Defendants, The Public Library of Cincinnati and Hamilton County
("Library"), the Board of Trustees of The Cincinnati and Hamilton County Public Library, Monica
Donath Kohen, Elizabeth H. LaMacchia, Karen R. Clemons, Nadine L. Allen, Robert G. Hendon,
Gregory W. Olson, Diane Cunningham Redden, Paula Brehm-Heeger, and Kyla Hardin
(hereinafter collectively referred to as "Public Library" or "Defendants"), by and through counsel,
and hereby respond to Plaintiff Noble's Motion for Summary Judgment ("Motion"). Noble's
Motion is not well-taken, as contrasted with the Public Library's pending Motion for Summary
Judgment which should be granted in its entirety.

I.      **GENERAL OVERVIEW**

First, the Public Library incorporates the facts and law as set forth in its Motion for
Summary Judgment (Doc. 12).

Further, as will be shown below, Noble's Motion is selective as to the facts recited, wrongly
applies the facts to the law, mischaracterizes the law, and fails to cite law when the law does not
support his position.

## II.     NOBLE'S "RED HERRING" FACTUAL RECITATION

The first portion of Noble's fact recitation refers to Noble's prior employee evaluations and his characterization as being a "great employee."  Noble's 30, 60, and 90 day reviews are entirely irrelevant. Noble's termination does not rely on nor is it predicated on his employee reviews for 2018, 2019, or 2020.  Neither does his termination nor this Court's analysis involve Noble's winning "Rookie of the Year."  Rather, this case revolves around a meme Noble posted on Facebook, which meme was not speech protected by the First Amendment.  Whether Noble, prior to the posting of the meme, was a "good employee" is immaterial.

Unfortunately, good or even great employees can engage in such egregious conduct that it warrants immediate termination.  Such is the case with Noble.  Given Noble's position and the nature of the meme, this is not a case warranting progressive discipline or "a second chance." Indeed, the Library would have faced potential liability if it did not terminate Noble's employment and, instead, permitted Noble an opportunity to carry out the threat depicted in the meme.

Next, Noble asserts in the second portion of his factual recitation (PageID 551) that "Mr. Noble's job was to apply unambiguous Library rules at the Main Library and whenever he was called to a different branch." While Noble did not have the discretion to create his own rules or policies, Noble was imbued with great discretion to perform the duties set forth in his job description. Those duties included but were not limited to engaging with customers, addressing situations in order to quickly defuse situations, discussing infractions with customers, securing premises and personnel by patrolling the property, monitoring and authorizing entrances and departures of employees, visitors and other persons, responding quickly to requests for security presence, and driving motor vehicles to transport individuals to specified locations. (Doc. 11-8,9 - Noble Deposition Exhibits 8, 9). Noble specifically admitted that, as a security officer, he could

not be a threat to the health or safety of other individuals in the workplace. (*Id*.; Doc. 11 - Noble Deposition, p. 77).

Regarding the Standards of Library Behavior (Doc. 10-5 - Liu Deposition Exhibit E), the standards note that the Library is committed to providing a secure and supportive environment for use of its resources and services.  The Standards list behavioral violations as well as Library policy violations and "violations of the Ohio Revised Code."  These Standards applied to Noble, and he was to apply them pursuant to his job duties and his discretion as a security officer. To suggest that Noble did not have any "discretion" belies Noble's receipt, acknowledgment, and understanding of his job description and Standards of Library Behavior.

Further, Noble was one of the few individuals at the Library entrusted with driving Library vehicles, including a Library van with signage that it was owned and operated by the Library. (Doc. 11 - Noble Deposition, pp. 66-67, 75). Yet Noble now suggests posting a "funny" meme on Facebook wherein he condones driving over protesters (his co-workers)[1] "splattering their lives" is somehow protected by the First Amendment.

Noble admits at PageID 552 that "the posting contained a depiction of a vehicle hitting stick figure people."  In the following paragraph, Noble tries to claim that the posting was made because "he did not care about the protests, and thought the meme succinctly expressed his views that 'when you start breaking the law or stopping traffic or destroying property, I don't agree that it's a protest anymore.'" (Motion, PageID 552.) The meme says nothing about protesters breaking the law, blocking traffic, or destroying property. The only violation of law exhibited in the meme is the driver's violent assault. Moreover, Noble's current arguments are self-serving and developed only after retaining counsel.

---

[1] Doc. 11-10 - Noble Deposition Exhibit 10.

It must be reiterated that when Noble was interviewed by his supervisor, Wei Liu, and the Library Human Resources department, shortly after posting the meme, Noble's only comment - which he repeated throughout the interview - was that he thought the meme was "funny." (Doc. 11 - Noble Deposition, pp. 110, 112, 114-115; Doc. 9 - Hardin Deposition, p. 36; Doc. 9-8 - Hardin Deposition Exhibit H). Only at his deposition, after having retained counsel and filed this lawsuit, does Noble manufacture some effort to say that his post had any redeeming social value.

In today's society, with the tragic recent happenings in Waukesha and elsewhere, a security officer's post depicting a vehicle running over people is not a matter of public comment and does not promote "the public interest in receiving the *well-informed* views of government employees engaged in civic discussion." *Bennett v. Metropolitan Government of Nashville & Davidson County*, 977 F.3d 530, 538-539 (2020), citing *Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006).

Noble emphasizes "that the post was only up for 24 hours." (Motion, PageID 553). Noble took it down immediately upon the request of a friend (as stated in his meeting with Human Resources and Liu) or of his mother (as stated in his deposition). Noble did not ask why the post should be removed, and he was not told why. (Doc. 11 - Noble Deposition, pp. 102-103, 125-126). Noble did not need to have it explained to him because he knew why the post should immediately come down. The meme had no value and, as Liu so articulately stated, it showed people being murdered. (Doc. 10 - Liu Deposition, p. 32). Had Noble truly been attempting to stimulate conversation on the merits of the protests, he would not have removed the meme less than 24 hours later at the first request or comment. (Doc 11 - Noble Deposition, pp. 101-102, 125-126).

Noble argues that "[o]n its face, the post did not state that he was going to run over individuals with his car[.]" (Motion, PageID 552). While the post itself does not "state" such in words, it does so "state" in its depiction. In fact, Noble admits as much in his preceding paragraphs

4

by recognizing "[t]he posting contained a depiction of a vehicle hitting stick figure people[,]" which depiction Noble endorsed by "sharing" the meme.  (*Id.*)

To try to soften the blow of the meme and its depiction, which is impossible, Noble refers to "snippets" of interviews by the Library. Noble attempts to argue some co-workers thought it was essentially "no big deal." (*Id.* at PageID 553). Noble ignores the complaints of critical co-workers. Noble cites no legal authority to support his insinuation that every co-worker must fear for his/her life before an employee can be terminated for violating a harassment policy and depicting violence against colleagues and patrons.

First, remember the testimony of Wei Liu regarding the violence of the meme. Second, remember the complaint by Ella Mulford, which brought the meme to the attention of Human Resources Director Kyla Hardin, and Mulford's reaction and her co-workers' reactions to the meme. (Doc. 9 - Hardin Deposition, pp. 9, 26; Doc. 11 - Noble Deposition Exhibit 10[2]).

Michael Guess noted that he "found it cringed [sic] worthy." "It was incredibly insensitive."  "[I]t should not be in the workplace." "I couldn't believe what I was seeing." "**I keep thinking about It is public that he works for PLCH on his FB page. How do the optics looked? I don't want the Public Safety to become a target. How does it look to the public and to the employees.**" (Doc. 9-8 - Hardin Deposition Exhibit H, PageID 210-211) (Emphasis added).

Greg Stahl, when interviewed, stated "My problem is the post was public.  **It makes it harder for us to do our job.  It calls into question, whether I can trust Eric to have my back**

---

[2] "[M]yself and many of our PLCH staff members were a part of those protests over the weekend, and to have someone in charge of staff and public safety post something so obscene is upsetting.  I had multiple staff send me this screenshot, as I am not connected with Mr. Noble on social media.  I know we do not have a social media policy, but staff confidence and comfort in this person protecting us and our customers is low."

**in any situation**.” “It is important that we do our jobs with as little bias as possible and I can't but help think that he has it.” (*Id*. at PageID 212-213) (Emphasis added).

Correna Kuhl, Library Services Assistant, noted “I was really disappointed by it, **he's a public safety officer and it's the polar opposite of how he should view things.**”  “Two other people that I've heard from are disturbed by it.” It “would be a concern more about him working with customers and whether he was treating them differently due to race and I worry about how his coworkers feel when you know he feels that way.”  “[M]ainly my concern is for people of color.” (*Id*. at PageID 216) (Emphasis added).

After Christina Morris, Public Safety at the Main Library, became “super emotional and was having a hard time talking,” and once she was able to compose herself, Morris stated, “It threw me for a loop, I trained with him when I started. . . . It was shocking, extremely shocking.”  “I would shut myself off from him, if I had to speak to him . . . This makes me question when we get calls especially to TeenSpot because most of the kids there are [B]lack.  It will make me want to take the call and head over there instead of letting him go because I will wonder if he is treating people different and I know I can be more level headed.  **I will just question his ability and the way he treats people going forward. . . . I had a negative reaction.  This was about police brutality, and he is in a position of public safety here**.” (*Id*. at PageID 217) (Emphasis added).

Noble posted the meme on his Facebook profile that identified himself as a security officer of the Library. (Doc. 11 - Noble Deposition, pp. 105-106). Noble directly called into doubt his ability to serve as a public safety officer. His colleagues were concerned about their safety as well as the safety of Library patrons. The meme did not “open discussion” for community interest and comment. Rather, it endorsed a violent threat that violated the Library's harassment policy. (Doc. 11-7 - Noble Deposition Exhibit 7; Doc. 12 - Defendants' Motion for Summary Judgment Exhibit

F - Affidavit of Paula Brehm-Heeger; Doc. 8 - Deposition of Paula Brehm-Heeger, pp. 29-30; Doc. 11-13 - Noble Deposition Exhibit 13).

Finally, as regards the Library's Board, Noble's sole factual allegation is that "the Board of Trustees for the Library approved Mr. Noble's 'personnel change' as a consent agenda item." This assertion is based on Noble's own Declaration.  This is not evidence about who terminated Noble and why.  Rather, this assertion simply reflects that Mr. Noble is no longer an employee - a personnel change. Paula Brehm-Heeger was the sole decision-maker who terminated Noble's employment. (Doc. 12-7 - Defendants' Motion for Summary Judgment Exhibit F - Affidavit of Paula Brehm-Heeger). There is no evidence supporting the Board of Trustees or its members being named as defendants in this case.

## III.    LAW AND ANALYSIS

### A.    The Meme Was Not Protected by the First Amendment Because It Was Not a Matter of Public Concern.

Initially, the Public Library incorporates herein by reference the arguments set forth in its Motion for Summary Judgment and supporting Memorandum. (Doc. 12).

Next, Noble largely bases his claim on the clearly distinguishable case of *Rankin v. McPherson*, 483 U.S. 378 (1987), addressed in greater detail below. Noble argues that "shocking and even painful feelings speech may inspire in co-workers is 'irrelevant as to whether it concerns a public matter.'" (Motion, PageID 556).  Although the meme does contain shocking and painful feelings after looking at it, there is more . . . much more.

Noble attempts to validate his claim by piggybacking the "obvious social and political concerns" raised in the protests themselves. (*Id*.) Whether the protests are speech protected by the First Amendment does not impact the analysis applied to Noble's meme, and Noble cites no legal

7

authority to allow such a jump. Valueless comments do not receive First Amendment protection simply because they reference other *actually* protected speech.

The Court must look at the speech and the "communicative purpose" of the speaker - here, a security officer.  The Court must examine the complete record and determine the focus of the statement for which the employee claims protection.  The proper inquiry is whether the point or focus of the speech advances only a private interest, or a public one.  See *Rogers v. Banks*, 344 F.3d. 587, 597-598 (6th Cir. 2003).

Here, the focus of the meme was Noble's own personal "beef" with the protests and protestors, and more pointedly, the endorsement that protestors should be run over/splattered/killed. The meme was posted on Noble's private Facebook page that identified him as a Library security officer. His co-workers were among the protesters. A public safety officer advocating for the death of those he serves is not a public interest.

The distinction with *Rankin* is critical. In *Rankin*, the speaker was given the title of "deputy constable" "because all employees of the Constable's office, regardless of job function, were deputy constables." *Rankin*, 483 U.S. at 380.

> [Her] duties were purely clerical. Her work station was a desk at which there was no telephone, in a room to which the public did not have ready access. Her job was to type data from court papers into a computer that maintained an automated record of the status of civil process in the county. Her training consisted of two days of instruction in the operation of her computer terminal.

*Id*. at 380-381.

Regarding the speech at issue in *Rankin*, the speaker was engaged in a conversation about the President's policies and their likely contribution to an assassination attempt. Then, the speaker said, in relevant part, "if they go for him again, I hope they get him." *Id*. at 381. There was no

8

evidence adduced that the President feared for his safety as a result of this clerical worker's comment. Nor was this desk clerk's ability to perform her duties called into doubt.

In finding the speech protected, the Court emphasized the nature of the speaker's job and that the speaker "was not brought by virtue of her job into contact with the public." *Id*. at 383.  Her "duties [were] . . . so utterly ministerial and her potential for undermining the office's mission so trivial" as to forbid her dismissal for expression of her political opinions." *Id*. "However ill-considered [the speaker's] opinion was, . . . it did not make her unfit for the job she held[.]" *Id*.

The *Rankin* Court further focused on the fact that the speaker did not make a threat toward the President. Here, Noble's colleagues feared for their own safety as well as the safety of the public Noble had direct access to and was supposed to serve. Applying the same principles, the *Rankin* Court would find Noble's speech unprotected.

Noble's reliance on *Rankin* to attempt to belatedly expand his motivation behind the meme is also misplaced. (Motion, PageID 557). Promptly following the meme's posting and quick removal, Noble was interviewed about the meme and its purpose. Noble repeated his one and only motivation for posting the meme - it was "funny." Only after retaining counsel and filing suit did Noble invent some other purpose. Noble admits his explanation to the Library was solely that the meme was "funny." (Doc. 11 - Noble Deposition, pp. 110, 112, 114-115[3]; Doc. 9 - Hardin Deposition, p. 36; Doc. 9-8 - Hardin Deposition Exhibit H).

---

[3] At Noble Deposition Page 115:
14· · · · · Q.· · Did you ever tell them that?
15· · · · · A.· · No, I did not.
16· · · · · Q.· · Were you asked a number of times
17· ·in the meeting why you posted it and your
18· ·response was you thought it was funny?
19· · · · · A.· · That is correct.

In *Rankin*, as outlined in Footnote 10, the speaker originally made the offending comment in the context of a discussion about the President's policies. When asked to repeat the comment to her supervisor, the speaker did not repeat the entire conversation but, instead, only repeated the comment at issue. The Court declined to consider the repeat in a vacuum and, instead, interpreted the comment within its original context. The same application does not help Noble, here. Noble had no legitimate or protected grounds for the basis of his speech at the time of its utterance. Only afterward did he manufacture an attempted valid motive to try to save this lawsuit. Even so, his attempts are unavailing.

Noble's hubris is evident in his contention that the "speech did not contain any slurs or reference to race. It did not directly threaten any protestor or co-worker[.]" Really? Noble's colleagues who feared for their own safety as well as the safety of the Library's Black patrons disagree. Yet, this is not a genuine issue of material fact that prevents the Public Library's award of summary judgment. The Library made a legitimate and lawful business decision when it enforced its Harassment in the Workplace policy and terminated Noble's employment.

As an aside, Noble also states that the "Library and Defendants are required to make a 'particularly strong showing' that his speech interfered with workplace functioning before taking action." (Motion, PageID 558). That is incorrect. It is only where an employee's speech "*substantially involved matters of public concern* that an employer may be required to make a particularly strong showing that the employee's speech interfered with workplace functioning before taking action." *Leary v. Daeschner*, 228 F.3d 729, 737 (6th Cir. 2000) (Emphasis added). Here, the speech in question does not "substantially involve matters of public concern." Therefore, no "particularly strong showing" is required.

B.      Noble's Free Speech Interests Do Not Outweigh the Public Library's Efficiency
        Interests.

The Court need not even conduct this analysis because, as outlined in greater detail in

Defendants' Motion for Summary Judgment (Doc. 12), the Court applies the *Pickering* test only

if the speech is of public concern, which Noble's was not. However, Defendants offer the following

should the Court elect to proceed with its assessment.

Noble, in the major portion of his "Law" section, cites no law.  Under Part 2.b.i-ii and

thereafter, he suggests that he is a stellar employee and based on that fact the 24-hour meme should

not be a basis for termination.  He also argues that the interest of the Library in terminating him

and losing confidence in him is not substantiated by his employment history.  Noble cites no law

in these sections because the law is absolutely against him (see Doc. 12), and Noble is "guilty" of

harassment under the Library's policies.  But this is not a Title VII action.

In assessing the Public Library's interest in promoting the efficiency of its services to staff

members and patrons, the Sixth Circuit considers whether an employee's comments, among other

things, (i) "meaningfully interfere with the performance of [his] duties"; (ii) "undermine a

legitimate goal or mission of the employer"; (iii) "create disharmony among co-workers"; or (iv)

"impair discipline by superiors." *Rodgers v. Banks*, 344 F.3d 587, 601 (6th Cir. 2003) (citation

omitted). As evidenced by the witness interviews and complaints detailed above, each of these

four factors are implicated by Noble's meme.

Even so, the Sixth Circuit in *Gillis v. Miller*, 45 F.3d 677 (2017) cited with approval

*American Postal Workers Union v. Postal Service*, 830 F.2d 294, 303 (D.C. Cir. 1987). "There are

cases where the harmful nature of speech is so apparent that no evidentiary inquiry need be made

into actual disruption of the employer's 'responsibilities to the public.'" *Id*. at 303, n.12.

As the Sixth Circuit added:

[L]ike the majority of our sister circuits, we "do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Anzaldua v. NE Ambulance & Fire Prot. Dist.*, 793 F.3d 822, 833-34 (8th Cir. 2015) (quoting *Hemminghaus v. Missouri*, 756 F.3d 1100, 1112 (8th Cir. 2014)); see also *Whitney v. City of Milan*, 677 F.3d 292, 298 (6th Cir. 2012) (A "government employer may take steps to ensure workplace harmony and need not 'allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action[.]" (quoting *Connick v. Myers*, 461 U.S. 138 at 152)). We therefore join those courts and the *Waters* plurality and hold that a public employer need not show actual disruption of the public agency in all cases in order to prevail under the *Pickering* balancing test. Instead, when the employer does not offer such evidence, we must assess whether the employer could reasonably predict that the employee speech would cause disruption, *Waters v. Churchill*, 511 U.S. 673-674 (1994), in light of "the manner, time and place" the speech was uttered, as well as "the context in which the dispute arose." *Rankin v. McPherson*, 483 U.S. 389 (1987).

Here, the harmful nature of the speech in question is apparent. In fact, it is so apparent that no evidentiary inquiry need be made into the actual disruption of the employer's responsibilities to the public. Like in *Gillis*, the Library could reasonably predict that the meme would disrupt legitimate security duties; disrupt the public's perception of the Library and its services; and disrupt the Library's interests in its protection of employees, the public, and property. In fact, the meme did cause those disruptions, as evidenced by Ella Mulford's and others' complaints.

Further, Noble contends that the Library sought to "silence speech" with which they did not agree. (Motion, PageID 563)). Thus, Noble contends that his termination deters a person of ordinary "firmness" from exercising his free speech rights. Noble's entire argument on this point is practically devoid of case law. The Public Library incorporates by reference the facts and analysis above as well as in Defendants' Motion for Summary Judgment.

Noble criticizes the Library for not "behav[ing] like a neutral agency" when the Library "[stood] in solidarity against the systems of oppression and racism that routinely lead to the loss of Black life, such as the murder of George Floyd, Ahmaud Arbery, and countless others." (*Id*. at

PageID 564). Noble argues without any legal support that a public agency cannot decry racism without violating the law. Such a contention is meritless and absurd.

## IV.     CONCLUSION

As a security officer, Noble's meme was not protected by the First Amendment.  The meme did not touch upon matters of public concern. Further, the meme fails the *Pickering* balancing test.

The Library was confronted by a horrendous meme endorsed by a security officer advocating the running over (i.e. murder) of protestors by a vehicle. The Library did not have to wait for the act depicted to actually occur before it be permitted to terminate the employee responsible for such a disturbing and harmful meme. Library personnel were afraid. They feared for their own safety as well as the well-being of their patrons. Noble's conduct was in violation of the Library's Harassment in the Workplace policy, and as such his employment was terminated.

Based upon the foregoing, as well as the facts and analysis outlined in Defendants' Motion for Summary Judgment (Doc. 12), Noble's Motion for Summary Judgment should be denied and Defendants should be granted dismissal.

Respectfully Submitted,

        */s/ Felix J. Gora*
Felix J. Gora (0009970)
Megan E. Mersch (0095428)
RENDIGS, FRY, KIELY & DENNIS, LLP.
600 Vine Street, Ste. 2650
Cincinnati, Ohio 45202
513-381-9200-Phone
513-381-9206-fax
fgora@rendigs.com
mmersch@rendigs.com
*Attorneys for Defendants*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this the 22nd day of December, 2021, a copy of the foregoing was filed electronically thought the Court's CM/ECF system which shall serve electronically a copy upon all counsel of record.

                                                          _/s/ Felix J. Gora_____
                                                          Felix J. Gora

2663387